STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

**19-789**


**ALLEN DEHART, ET AL.**

**VERSUS**

**BRUCE A. JONES, M.D., ET AL.**


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-20123593
HONORABLE THOMAS R. DUPLANTIER, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**VAN H. KYZAR**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Billy Howard Ezell, Phyllis M. Keaty, and Van H. Kyzar, Judges.


**JUDGMENT VACATED IN PART AND RENDERED;**
**AFFIRMED IN PART; AND REMANDED.**

**Samuel David Abraham**
**5040 Ambassador Caffery Parkway**
**Lafayette, LA 70508**
**(337) 234-4524**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
    **Allen Dehart**
    **Adrienne Dehart**
    **Ashley Dehart**
    **Anissa Dehart**

**Nicholas Gachassin, III**
**Brandon M. Rhodes**
**Julie Savoy**
**Gachassin Law Firm**
**P. O. Box 80369**
**Lafayette, LA 70598-0369**
**(337) 235-4576**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
    **Lafayette General Medical Center**
    **Amy Falconer**

**Alan K. Breaud**
**Breaud & Meyers**
**P. O. Drawer 3448**
**Lafayette, LA 70502**
**(337) 266-2200**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Bruce A. Jones, M.D.**

**KYZAR, Judge.**

In this medical malpractice case, the plaintiffs, Allen, Adrienne, Ashley, and Annisa DeHart, appeal from a trial court judgment in favor of the defendants, Lafayette General Medical Center and Amy Falconer, finding no genuine issue of material fact as to the defendants' breaches of the standard of care or causation, on issues of excessive bleeding and negligent advertising/informed consent and dismissing their claims against the defendants with prejudice. For the following reasons, we vacate in part and render judgment, affirm in part, and remand.

## DISCUSSION OF THE RECORD

The facts of this matter were addressed in our prior opinion, *DeHart v. Jones*, 18-764, pp. 2-3 (La.App. 3 Cir. 3/27/19), 269 So.3d 801, 803-04, as follows:

> This medical malpractice action arises out of surgical complications during a robotically-assisted heart valve repair surgery performed on Arlene DeHart by Dr. Bruce Jones at LGMC. Ms. Falconer acted as perfusionist. During the procedure, Mrs. DeHart bled profusely from her femoral artery. Plaintiffs, Mrs. DeHart's husband and children, alleged this excessive bleeding and inadequate perfusion flow led to the eventual failure of Mrs. DeHart's kidneys, which contributed to her death within a month of surgery on October 27, 2008. After timely submitting the matter to a medical review panel, Plaintiffs filed suit on June 26, 2012, against LGMC and Ms. Falconer, among other defendants.
>
> As to LGMC and Ms. Falconer, Plaintiffs alleged that the surgical staff breached the applicable standard of care in failing to communicate to Dr. Jones the source, extent, significance, and magnitude of the bleed and its adverse impact on Mrs. DeHart's hemodynamics. Plaintiffs further alleged that LGMC was negligent in its advertising and marketing of the robotic surgery and in obtaining Mrs. DeHart's informed consent for the procedure.
>
> On May 15, 2018, LGMC and Ms. Falconer filed their motion for partial summary judgment on the ground that Plaintiffs could not carry their burden of proof as to breach or causation in their claims regarding the bleeding issue. LGMC and Ms. Falconer then filed a second motion for partial summary judgment on May 23, 2018, arguing that Plaintiffs could not carry their burden of proof as to duty or causation relating to their negligent advertising/informed consent claims. Both motions were set for hearing on June 18, 2018. The Lafayette Parish Sheriff's Office served Plaintiffs with notice of the

June 18, 2018 hearing date on May 29, 2018. Thereafter on June 1, 2018, Plaintiffs filed a motion to strike both motions because they were not served with notice of the court date thirty days before the hearing as mandated by La.Code Civ.P. art. 966(C)(1)(b). On June 18, 2018, the trial court denied the motion to strike and continued the hearing on the partial summary judgment motions to June 27, 2018. In response, Plaintiffs filed another motion to strike, again for lack of timely notice of the hearing date. The trial court denied the motion to strike and ultimately granted LGMC's and Ms. Falconer's motions, dismissing them "entirely from this lawsuit with prejudice on summary judgment."

The DeHarts appealed the trial court's July 16, 2018 judgment in favor of Lafayette General Medical Center (LGMC) and Amy Falconer (Ms. Falconer or "the perfusionist") (referred to collectively as "the defendants"). On appeal, we vacated the judgment because the defendants' motions "were granted without the thirty-day notice required by La.Code Civ.P. art. 966(C)(1)(b)," granted the DeHarts' motions to strike the motions, and remanded the matter for further proceedings. *Id.* at 805.

Once the matter was back in the trial court, the defendants again moved for partial summary judgment on the excessive bleeding and negligent advertising/informed consent issues. The DeHarts opposed both motions with supporting documents, including opinion evidence by Dr. Jeffery A. Green, an anesthesiologist, and Alfred H. Stammers, a perfusionist. The defendants objected to these exhibits and moved to strike them in their reply memorandum.

At the July 1, 2019 hearing, the trial court sustained the defendants' objection and granted their motion to strike Dr. Green's opinion evidence but overruled their objection as to Mr. Stammers. Next, the trial court granted judgment in favor of the defendants on both the excessive bleeding and negligent advertising/informed consent issues, finding no genuine issue of material fact as to the defendants' breach of the standard of care or causation on either issue. Written judgment was rendered on July 22, 2019. It is from this judgment that the DeHarts appeal.

2

On appeal, the DeHarts raise four assignments of error:

1. Whether the trial court erred in not allowing Plaintiffs/Appellants [e]xpert testimony of Jeffery Green into evidence[.]

2. Whether the trial court erred in granting Motions for Summary Judgment when genuine issues of material fact existed.

   a. Did Lafayette General Medical Center, its Nurses, Perfusionist and staff seek help outside of the Operating Room as Mrs. DeHart continued to bleed out, as the standard of care required.

   b. Was Communication among the team adequate and did the communication level comply with the standard of care.

3. Did LGMC [sic] comply with their duty to make sure the informed consent form was properly completed and filled out as required by CMS and the Joint Commission for [A]ccreditation in order to participate in their programs[.]

4. Material facts exist concerning whether the breaches of the standards of care caused Mrs. DeHart to suffer injuries[.]

## OPINION

"[S]ummary judgment is a procedural device used when there is no genuine issue of material fact for all or part of the relief prayed for by a litigant." *Murphy v. Savannah*, 18-991, p. 6 (La. 5/8/19), 282 So.3d 1034, 1038; La.Code Civ.P. art. 966(A). Appellate courts review summary judgment *de novo* using the same criteria that governs the trial court's determination of whether summary judgment is appropriate, i.e., whether there is any genuine issue of material fact, and whether the mover is entitled to judgment as a matter of law. *Wright v. La. Power & Light*, 06-1181 (La. 3/9/07), 951 So.2d 1058; La.Code Civ.P. art. 966(A)(3).

A material fact is one that "potentially insures or precludes recovery, affects a litigant's ultimate success, or determines the outcome of the legal dispute." *Hines v. Garrett*, 04-806, p. 1 (La. 6/25/04), 876 So.2d 764, 765 (per curiam). "A genuine issue of material fact is one as to which reasonable persons could disagree; if

3

reasonable persons could reach only one conclusion, there is no need for trial on that issue and summary judgment is appropriate." *Smitko v. Gulf S. Shrimp, Inc.*, 11-2566, p. 8 (La. 7/2/12), 94 So.3d 750, 755.

If the mover will not bear the burden of proof at trial, it need only point out "the absence of factual support for one or more elements essential to the adverse party's claim, action, or defense." La.Code Civ.P. art. 966(D)(1). Once this occurs, the burden shifts to "the adverse party to produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law." *Id.* "Because it is the applicable substantive law that determines materiality, whether a particular fact in dispute is 'material' for summary judgment purposes can be seen only in light of the substantive law applicable to the case." *Jackson v. City of New Orleans*, 12-2742, 12-2743, p. 6 (La. 1/28/14), 144 So.3d 876, 882, *cert. denied*, 574 U.S. 869, 135 S.Ct. 197 (2014).

In order to establish their medical malpractice claim, the DeHarts must prove by a preponderance of the evidence: (1) the standard of care appliable to the medical provider; (2) that the medical provider breached the standard of care; and (3) a causal connection between the breach and the resulting injury. La.R.S. 9:2794(A). Nurses and medical technicians performing medical services are subject to the same standard of care as physicians. *Belmon v. St. Francis Cabrini Hosp.*, 427 So.2d 541 (La.App. 3 Cir. 1983). The standard of care, as provided by La.R.S. 9:2794(A)(1), is that "degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians . . . licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances." The standard of care for a physician or nurse practicing in a particular specialty is that degree of care ordinarily practiced by physicians or nurses within that specialty. La.R.S. 9:2794(A)(1).

4

The standard of care applicable to a hospital was discussed in *Lewis v. Cornerstone Hospital of Bossier City, LLC,* 53,056, pp. 9-10 (La.App. 2 Cir. 9/25/19), 280 So.3d 1262, 1269:

> In a malpractice claim against a hospital, the plaintiff must prove, as in any negligence action, that the defendant owed the plaintiff a duty to protect against the risk involved, the defendant breached that duty, the plaintiff suffered an injury, and the defendant's actions were a substantial cause in fact of the injury. *McGlothlin v. Christus St. Patrick Hosp.,* 2010-2775 (La. 7/1/11), 65 So. 3d 1218; *Little v. Pou,* 42,872 (La. App. 2 Cir. 1/30/08), 975 So.2d 666, *writ denied,* 2008-0806 (La. 6/6/08), 983 So. 2d 920. A hospital is liable for its employee's negligence, including its doctors and nurses, under the doctrine of *respondeat superior. Little v. Pou, supra,* and citations therein. A hospital is bound to exercise the requisite standard of care toward a patient that the particular patient's condition may require and to protect the patient from external circumstances peculiarly within the hospital's control. *McGlothlin v. Christus St. Patrick Hosp., supra*; *Richardson v. Christus Schumpert Health Sys.,* 47,776 (La. App. 2 Cir. 2/27/13), 110 So. 3d 264, *writ denied,* 2013-0621 (La. 4/19/13), 112 So. 3d 228. The mere fact that an injury occurred or an accident happened does not raise a presumption that the hospital was negligent. *Campo v. Correa,* 2001-2707 (La. 6/21/02), 828 So. 2d 502; *Richardson v. Christus Schumpert, supra.*

"Expert testimony is required to establish the standard of care of both the physician and hospital in a medical malpractice action, unless the negligence complained of is so obvious that a layperson can infer the negligence without the aid of expert testimony." *Baez v. Hosp. Serv. Dist. No. 3 of Allen Parish,* 16-951, pp. 5-6 (La.App. 3 Cir. 4/5/17), 216 So.3d 98, 103.

*Assignment of Error Number One*

We first consider the DeHarts' assertion that the trial court erred in excluding Dr. Green's opinion evidence. The defendants introduced Dr. Green's deposition testimony in support of their motion on the excessive bleeding issue, wherein he stated that he did not think he was being asked to render opinions on whether the perfusionist or LGMC's surgical staff breached the standard of care during the patient's procedure. In opposing this motion, the DeHarts submitted Dr. Green's

5

affidavit, report, and deposition testimony, which the defendants objected to in their reply brief. During the July 1, 2019 hearing, the trial court sustained the defendants' objection and ruled Dr. Green's opinion evidence inadmissible.

On appeal, the DeHarts argue that Dr. Green testified that the surgical staff failed to communicate the extent of the patient's bleeding to Dr. Jones, that the perfusionist failed to relay information to him concerning the patient's flows and pressures, and that these failures prevented Dr. Jones from addressing the excessive bleeding issue properly. They further argue that Dr. Green causally connected the blood transfusions necessitated by the patient's blood loss to her post-operative kidney failure, pulmonary complications, and infections. Thus, they claim that because Dr. Green was qualified to render an opinion on these issues, his testimony was relevant and should have been admissible.

The defendants' argument concerning the admissibility of Dr. Green's opinion testimony is four-fold: 1) Dr. Green is not qualified to render opinions as to the standard of care applicable to the perfusionist and the surgical staff because he is an anesthesiologist; 2) his testimony did not create a genuine issue of material fact because he admitted that he would not be rendering standard of care opinions as to the perfusionist and the surgical staff at trial; 3) his testimony should be excluded based on the law of the case doctrine; and 4) his testimony should be excluded because it is based on an assumption.

The defendants point to the following colloquy from Dr. Green's deposition, which they relied on during the prior summary judgment hearing:

> Q. I just want to make sure that I have all your opinions with regard to Ms. Falconer's breaches in the standard of care. Can you run those down for me, just so I'm sure that we've talked about them all?
>
> A. I don't believe that I'm being asked to deliver opinion about any breaches in the standard of care for the perfusionist.

Q. You do not expect to testify to that if we go to court in this?

A. I do not.

Q. With regard to the nurses, have we -- have I heard all of your opinions with regard to their breaches in the standard of care, or can you run those down for me, just so I'm sure that I've heard them all?

A. Like Ms. Falconer, I don't believe that I'll be asked to provide standard-of-care opinions in this case.

Q. You did include that in your affidavit which is why I ask. So despite the fact that you've included that in your affidavit, if this case were to go to trial, you do not expect to give an opinion with regard to the nurses and the techs with regard the nurses and the techs with regard to their breaches of the standard of care?

A. Right. Not regarding standard of care. I certainly have opinions about their activities, but I don't believe I'll be asked to testify to standard-of-care breaches for them.

At the outset, we find no merit in the defendants' argument concerning the law of the case doctrine. The trial court's prior ruling excluding Dr. Green's opinion evidence was contained in the July 16, 2018 judgment, which was vacated by this court in the prior appeal. Accordingly, we find the law of the case doctrine inapplicable.

The central question, which the trial court failed to address in excluding Dr. Green's opinion evidence, is whether he is, in fact, qualified to render opinions regarding the standard of care and breaches by the perfusionist and surgical staff, and not whether he was asked, or anticipated being called upon, to render those opinions at trial. As Dr. Green stated in his deposition, he has "opinions about their activities," and he asserted those opinions in his affidavit, report, and deposition testimony.

The DeHarts claim that the defendants' objection was limited by La.Code Civ.P. art. 966, to the timeliness of their submission and the form of their evidence. However, the supreme court, in *Independent Fire Insurance Co. v. Sunbeam Corp.*,

7

99-2181, 99-2257, p. 14 (La. 2/29/00), 755 So.2d 226, 235, adopted "the *Daubert*[1]

standards for admissibility of expert opinion evidence at the summary judgment

stage[.]" In *Thomas v. Drew*, 17-818, p. 5 (La.App. 3 Cir. 3/7/18), 240 So.3d 980,

983, this court held:

> Dr. Drew did challenge the qualification of Dr. Gros in his reply memorandum. Therefore, he followed the proper procedure pursuant to La.Code Civ.P. art. 966(D)(2) in objecting to Dr. Gros's affidavit. We do agree with Mr. Thomas that in deciding whether to admit an expert opinion affidavit at the summary judgment stage, the *Daubert* standards should be considered by the trial court in determining whether the expert is qualified to render an opinion. *Independent Fire Ins. Co. v. Sunbeam Corp.*, 99-2181, 99-2257 (La. 2/29/00), 755 So.2d 226.

Thus, we find that the defendants properly challenged Dr. Green's qualifications in

their reply memorandum.

However, regarding the merits of the objection, we find that the trial court

excluded Dr. Green's expert opinion evidence without first conducting a hearing to

properly consider whether he was qualified to render such an opinion. During the

hearing, the trial court stated the following:

> The objection to Green was earlier, it was done last time. It's done this time. And I think pertinent to the argument is that Dr. Green does say: I'm not a perfusionist. I'm not called to be an expert in this field. And I don't think you can use him in this part of your case to suggest that there was some issue with flow and all the other stuff, and I'm going to sustain the objection to Dr. Green's opinion with regards to this matter.

The admissibility of expert testimony is provided for in **La.Code Evid. art.**

**702(A)**, which states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (1) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

---

[1] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993).

8

(2) The testimony is based on sufficient facts or data;

(3) The testimony is the product of reliable principles and methods; and

(4) The expert has reliably applied the principles and methods to the facts of the case.

In medical malpractice cases, the qualification of an expert witness is specifically governed by **La.R.S. 9:2794(D)**, which provides in part:

(1) In a medical malpractice action against a physician . . . for injury to or death of a patient, a person may qualify as an expert witness on the issue of whether the physician departed from accepted standards of medical care only if the person is a physician who meets all of the following criteria:

(a) He is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose.

(b) He has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim.

(c) He is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of care.

(d) He is licensed to practice medicine by the Louisiana State Board of Medical Examiners under R.S. 37:1261 et seq., is licensed to practice medicine by any other jurisdiction in the United States, or is a graduate of a medical school accredited by the American Medical Association's Liaison Committee on Medical Education or the American Osteopathic Association.

. . . .

(3) In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness is board certified or has other substantial training or experience in an area of medical practice relevant to the claim and is actively practicing in that area.

(4) The court shall apply the criteria specified in Paragraphs (1), (2), and (3) of this Subsection in determining whether a person is

9

qualified to offer expert testimony on the issue of whether the physician departed from the accepted standards of medical care.

A similar issue was addressed in *Pertuit v. Jefferson Parish Hospital Service District No. 2*, 14-752 (La.App. 5 Cir. 5/14/15), 170 So.3d 1106, *writ denied*, 15-1176 (La. 9/18/15), 178 So.3d 152. Therein, the plaintiff filed medical malpractice claims against a neurosurgeon and a hospital. The plaintiff's expert, an interventional neurologist, rendered a report and then was deposed by the defendant three years later. Approximately two-and-a-half years later, and six weeks prior to trial, the defendant neurosurgeon moved for summary judgment, arguing that the plaintiff's expert, who was not a neurosurgeon, was not qualified to render an opinion against him.

Following argument on the motion, but without holding an evidentiary hearing, the trial court held that the plaintiff's expert was not qualified to render an expert opinion, and that absent such an opinion, there was no genuine issue of material fact, and the defendant neurosurgeon was entitled to summary judgment. In reversing the judgment, the fifth circuit noted that an expert need not be engaged in the same specialty to render an expert opinion on the specialty in question.

> We note that La. R.S. 9:2794 has no absolute requirement that a proffered expert must practice in the same specialty as the defendant, or be board certified in that specialty. Rather, the statute allows that an expert may be qualified on the basis of her "training or experience," and that board certification and practice in the area of specialty are factors that the trial court must consider in making this determination. Only in cases where the alleged acts of negligence raise issues peculiar to the particular specialty involved is expert testimony limited to those qualified in that specialty. *Howard v. Vincent*, 11-0912 (La.App. 4 Cir. 03/28/12), 88 So.3d 1219, 1222, *writ denied*, 12-0967 (La.6/22/12), 91 So.3d 970. Furthermore, our jurisprudence has recognized that where medical disciplines overlap, it is appropriate to allow a specialist in one field to give expert testimony as to the standard of care applicable to areas of the practice of medicine common to both disciplines. *See*, *Coleman v. Deno*, 99-2998 (La.App. 4 Cir. 04/25/01), 787 So.2d 446, 448, *aff'd in part, modified in part, and remanded*, 01-1517 (La.01/25/02), 813 So.2d 303.

*Id.* at 1110.

Accordingly, the fact that Dr. Green is not a perfusionist is not, in and of itself, grounds for disqualifying his opinion as to the standard of care and potential breaches by the perfusionist and the surgical staff. Although he might be found unqualified to render an opinion, Dr. Green's qualifications to do so are not clear from the record. Additionally, the fact that he was not retained to render opinions on these specialties has no bearing on his qualification to do so.

The need for a hearing to determine expert qualifications and methodology was fully discussed in *Pertuit*, 170 So.3d at 1111-13 (last alteration ours) (footnotes omitted), and is equally applicable here:

> In *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the United States Supreme Court set a new standard to assist trial courts in evaluating the admissibility of expert testimony and required the district courts to perform a "gatekeeping" function to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 113 S.Ct. at 2795. The *Daubert* standard, which was adopted by the Louisiana Supreme Court in *State v. Foret*, 628 So.2d 1116 (La.1993), requires that expert scientific testimony must rise to a threshold level of reliability in order to be admissible under La.-C.E. art. 702. *Foret*, 628 So.2d at 1123. The decision in *Daubert*, however, concerned the admissibility of the expert's opinion based on methodology used and not on his or her qualification as an expert in the area tendered, which is the issue raised in the present case. The Louisiana Supreme Court addressed the issue of an expert's qualification in the area tendered in the case of *Cheairs v. State ex rel. Department of Transp. and Development*, 03-0680 (La.12/3/03), 861 So.2d 536.
>
> In *Cheairs*, the Court adopted a three-prong inquiry to give trial courts more comprehensive guidance in determining the admissibility of expert testimony. The admission of expert testimony is proper only if: (1) the proposed expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical or specialized expertise, to understand the evidence or to determine a fact in issue. *Cheairs*, 861 So.2d at 542. As explained in *Cheairs*, these factors are reflective of the considerations under La.-C.E. art. 702 and whether the admissibility of the expert testimony would assist the trier of fact to understand the evidence or to determine a fact in issue. The

11

Court also recognized that experience alone is normally sufficient to qualify a witness as an expert. *Id.* at 541-42.

Although the discussions in *Daubert*, and its progeny, clearly contemplate the trial court conducting an evidentiary hearing in order to perform its gatekeeping function, the Louisiana Supreme Court, since its adoption of the *Daubert* standard in *Foret*, has not established a rule that mandates an evidentiary hearing in all cases where an expert's qualifications are challenged. However, the discussion in *Foret* clearly indicates that the Louisiana Supreme Court also contemplates the holding of an evidentiary hearing in most cases where an expert's qualifications are challenged. In *Foret*, the Court noted that the tardy submission of the expert's report (on the morning of trial) prevented the trial court from properly exercising its gatekeeping function. The Court further stated: "[t]he record is silent regarding any efforts by the trial court to determine, *via some sort of evidentiary hearing*, whether or not the [expert's] confidence in his ability to diagnose [the condition] was well-founded." *Foret, supra* at 1123 (emphasis added). The Court additionally stated: "[i]f the trial court had conducted a hearing, it might have discovered the misgivings many experts and courts alike have with this type of testimony [regarding Child Sexual Abuse Accommodation Syndrome]." *Id.* at 1124. And finally, the Court noted that the rules that it established in the decision regarding the admissibility of evidence in the particular field of expertise in question, did not preclude future trial courts, "performing [their] gatekeeping function via an evidentiary hearing," from considering the admissibility of such evidence. *Id.* at 1131.

Likewise, in *Cheairs*, the Louisiana Supreme Court did not establish a rule that mandates an evidentiary hearing whenever an expert's qualifications are challenged. However, the Court recognized the benefit of such hearing, not only to the trial court, but also to a reviewing appellate court, when it stated: "[w]e have closely reviewed the district court's decision to qualify [plaintiff's expert] . . . *in light of the evidence presented at the pre-trial 'Daubert' hearing . . .*" *Cheairs, supra* at 543 (emphasis added).

It is clear from a reading of *Foret* and *Cheairs*, and their progeny, that the generally accepted procedure used to challenge an expert's qualifications is to make a *Daubert* challenge, which generally will result in an evidentiary hearing regarding the expert's qualifications. However, we can envision cases in which the area of discipline of the proffered expert is so greatly divergent from that of the defendant, and the alleged acts of negligence are so clearly limited to treatment that is unique to the defendant's specialty, that such an evidentiary hearing may not be necessary, although we would anticipate that such cases would occur infrequently. We therefore are not prepared to establish a hard-fast rule that mandates an evidentiary hearing whenever an expert's qualifications are challenged. A particular specialist's knowledge of the subject matter on which he is to offer testimony is determined on a case by case basis. *Howard* [*v. Vincent*, 11-912

(La.App. 4 Cir. 3/28/12), 88 So.3d 1219,] 1222. Likewise, we conclude that the determination of whether an evidentiary hearing is necessary must also be made on a case by case basis.

In the present case, Dr. Johnston did not file a motion *in limine* (or any similar type motion) challenging Dr. Wojak's qualifications, in effect side-stepping the generally accepted procedure. He thereby virtually invited the trial court to perform its gatekeeping function without conducting an evidentiary hearing. In response to Mrs. Pertuit's complaint regarding the procedure used, Dr. Johnston contends that he did not argue to the trial court that Dr. Wojak's testimony was inadmissible, but rather that it was insufficient to meet La. R.S. 9:2794's burden of proof. He further contends, without citation to authority, that a 9:2794 analysis does not require a *Daubert* challenge or determination, or an evidentiary hearing.

Clearly, when a litigant seeks a ruling that his opponent's expert is not qualified to render an opinion, he is seeking a ruling on admissibility of that expert's opinion. Equally clear is that in this case, the trial court, in finding that Dr. Wojak was not qualified to render an opinion in this matter, was ruling Dr. Wojak's opinion inadmissible. Anything short of a total exclusion of her opinion would have required the trial court to engage in an impermissible weighing of the experts' contradictory opinions, thereby rendering summary judgment inappropriate.

On the particular facts of the case before us, where there appears to be a colorable claim of overlap between the disciplines of Dr. Wojak and Dr. Johnston, we find that the proper procedure for Dr. Johnston to have followed would have been to make a *Daubert* challenge, thus affording Mrs. Pertuit an evidentiary hearing on Dr. Wojak's qualifications. *See Guardia v. Lakeview*, 08-1369 (La.App. 1 Cir. 05/08/09), 13 So.3d 625 (appellate court found summary judgment premature where trial court disqualified plaintiff's expert without first conducting a hearing on defendant's motion *in limine* to strike plaintiff's expert to determine if expert's testimony constituted reliable expert testimony as contemplated in *Cheairs*). We therefore conclude that the trial court erred in not affording Mrs. Pertuit an evidentiary hearing on Dr. Wojak's qualifications before making the determination that she was not qualified. Having found that the appropriate procedure was not followed to determine Dr. Wojak's ability to testify in this matter, and having vacated the grant of summary judgment as premature, we pretermit any discussion of the merits of Dr. Wojak's qualifications.

Thus, we conclude that the trial court erred in rejecting Dr. Green's opinion evidence without first conducting a hearing to determine his qualifications to render opinions as to the perfusionist and the surgical staff. Accordingly, the trial court's

13

grant of summary judgment on the excessive bleeding issue was premature, and as such, is vacated for this reason. However, unlike the situation in *Pertuit*, where the plaintiff's only opposition evidence was the sole expert's opinion, we conclude that there is sufficient evidence in the record, absent Dr. Green's opinion, for us to conduct a *de novo* review of the defendants' summary judgment motion on the excessive bleeding issue.

### *Assignments of Error Numbers Two and Four*

In their second and fourth assignments of error, the DeHarts argue that the trial court erred in finding no genuine issue of material fact exists regarding the communication and chain of command issues during the procedure. The DeHarts contend that the applicable standard of care required the perfusionist and surgical staff to communicate the source, extent, and magnitude of the blood loss suffered by Mrs. DeHart to Dr. Jones. They further argue that the standard of care required the perfusionist and the surgical staff to seek help outside of the operating room as Mrs. DeHart continued to bleed.

Based on the appeal record, the following timeline occurred during the surgery:

| | |
|---|---|
| 0718: | Start of anesthesia |
| 0957: | Start of surgery |
| 1100: | Patient on cardiopulmonary bypass machine |
| 1106: | Endoaortic clamp applied |
| 1149: | Volume added to the cardiopulmonary bypass machine for the first time. |
| 1228: | Endoaortic clamp removed |
| 1310: | Patient off cardiopulmonary bypass machine |
| 1356: | Patient back on cardiopulmonary bypass machine because of dropping blood levels; patient resuscitated by anesthesia; multiple drips and volume resuscitation performed |
| 1403 | Patient losing volume |
| 1408 | Patient losing volume |
| 1413 | Patient losing volume |
| 1414: | Patient losing volume |
| 1415: | Patient losing volume |

14

| 1420: | Patient losing volume |
|---|---|
| 1527: | Patient off cardiopulmonary bypass machine |
| | Patient's right femoral artery decannulated and Dr. Jones attempted to close the right groin. Patient's blood pressure fell into twenties and thirties. |
| 1555: | Emergent sternotomy performed due to patient's blood pressures falling to twenties and thirties; chest opened and open cardiac massage performed and resuscitation by anesthesia |
| 1720: | Procedure over |
| 1725: | Patient in surgical recovery |
| 1810: | Patient in ICU |

The DeHarts alleged the following acts of negligence on the part of the named defendants in their petition:

A. Allowing the Petitioner to undergo a surgery for which she was not a candidate[.]

B. Failing to perform necessary and appropriate test and imaging studies necessary to ensure safe placement of a Rummel Tourniquet, falling below the appropriate standard of care.

C. Failing to fully inform the deceased of alternative approaches and the risk associated with those approaches given her pre-existing condition, falling below the appropriate standard of care.

D. Failing to adequately secure a Rummel Tourniquet[.]

E. Failing to adequately monitor the Rummel Tourniquet[.]

F. Failing to properly and adequately document the ongoing procedure said documentation, [sic] falling below the appropriate standard of care.

G. Failing to properly obtain informed consent from Arlene Dehart [sic] [.]

H. Misleading through advertisement and marketing the risks associated with the type of surgery offered to Arlene DeHart.

I. Failing to timely and properly tend to the excessive bleeding during the surgery, said failure and delay falling below the appropriate standard of care.

In light of the excessive bleeding issue, we find that the only allegations of negligence applicable to the perfusionist are "F." and "I.", and the only allegations applicable to the surgical staff are "E.", "F.", and "I."

In their motion, the defendants moved for partial summary judgment:

> [D]ismissing all claims asserted against [the perfusionist] and [LGMC's surgical staff] as referenced in [the DeHarts'] Petition for Damages, relating to the patient's intra-operative bleeding at the site of her femoral vessel cannulization at her right groin, and the alleged failure to notify the co-defendant surgeon, Dr. Bruce Jones, of the bleeding and the patient's volume replacement needs.

As the mover, the defendants bore the initial burden of pointing out an absence of factual support for at least one essential element of the DeHarts' claim. La.Code Civ.P. art. 966(D)(1). We find that they carried their burden with regard to the perfusionist with the medical review panel opinion, which found no breach of the standard of care by Ms. Falconer. The medical review panel stated that Ms. Falconer "monitored the pump flow rates and mean arterial pressure throughout the pump run and notified of blood administration to the patient in a timely fashion." The defendants also introduced Ms. Falconer's deposition testimony, wherein she stated that she required Dr. Jones' permission every time she added volume to the bypass machine.

Although the medical review panel opinion did not specifically address whether the surgical staff breached the standard of care, the defendants introduced testimony from the members of the surgical staff and Dr. Jones, which indicated that all of the surgical staff were aware of and informed Dr. Jones about the patient's excessive bleeding. Dr. Jones admitted that he was informed about the bleeding, he inspected the site of the bleeding, and he decided to address the issue in the short term by packing the site with lap pads and then more fully after the robotic procedure was completed.

Dr. Jones outlined the steps that he took after the surgical staff notified him about the bleeding:

> Again, my practice, my normal practice would be evaluation of it, which was done by having [Ms. Conner] expose the groin to me

better so I could see what was going on, and typically what we will do is if it's, if its deemed not emergent at that time, typically what we will do is pack the wound with lap pads. If it's a little more significant or what not, however you want to define significant, we might occasionally put a suction catheter there.

Now remember again, my focus is on trying to repair these valves and get this patient off of bypass, get this patient off of cardiac arrest, so I have to weigh risk and benefits of taking the time out to try to recannulate this person, which would be, you know, have its own inherent problems, perhaps disastrous, while her heart is stopped and her heart is open. So my focus, again, is on the chest and fixing that, weighing the risk of packing this wound, and that's what we elected to do.

Dr. Jones testified that applying direct pressure to the bleeding with the lap pads was the standard of care applicable in this situation. He further stated that he actually saw the site packed with lap pads. He said that once the site was packed, he and the surgical staff continued monitoring it for additional bleeding.

The defendants also introduced Dr. Engleman's testimony, which indicated that the decision of when to address surgical bleeding rests with the surgeon. Accordingly, the burden shifted to the DeHarts to present evidence sufficient to show that they would be able to satisfy their burden of proof at trial.

In their opposition, the DeHarts introduced testimony from Dr. Jones, as well as his operative report; testimony from Ms. Falconer, Isaiah Duhon, Jessica Reilly, Charisse Conner, Brian Deshotel, Christopher Dunn, and Dr. Todd Ackal, the perfusionist, surgical staff members, nurse anesthetist, and anesthesiologist; the deposition of Dr. Azeem Khan; testimony from Dr. Daniel Engleman; expert opinion evidence from Bernadette McDonald, a registered nurse, Alfred H. Stammers, a perfusionist, Dr. James G. Traylor, Jr., a forensic pathologist, and Timothy F. Hawkins, a Healthcare Safety Professional and Hospital Administration Executive; and the defendants' responses to their second and fifth sets of interrogatories and requests for production of documents.

17

In his operative report, Dr. Jones gave an overview of the surgery as follows:

> The procedure went fairly unremarkable [sic], however upon completion of the procedure, the patient required placement back on cardiopulmonary bypass and significant cardiovascular support to maintain adequate blood pressures. Her Rummel tourniquet in right groin for femoral arterial cannula had inadvertently apparently become loosened during the operation and she lost [a] significant amount of blood from her right femoral artery during the procedure.

In describing the surgery in detail, Dr. Jones stated that the following occurred at the conclusion of the robotic procedure:

> The patient resumed spontaneous sinus rhythm and did not require defibrillation. She was now ventilated and slowly weaned from bypass. Suture lines were closely examined with the camera at this point. The patient unfortunately was unable to maintain blood pressure and necessitated resuming cardiopulmonary bypass. While anesthesia was working to resuscitate the patient, multiple drips were used and volume resuscitation was also performed.
>
> The patient was eventually ventilated again and weaned from bypass. Again, suture lines were examined closely with the camera and noted to be hemostatic. Ports appeared to be hemostatic as well. The patient was echoed at this time and valve findings were as above. The patient was decannulated and Protamine was given. While closing the right groin, the patient's blood pressure continued to fall to where pressures were in the 20s and 30s, and a sternotomy was emergently performed. The chest was entered without difficulty. Open cardiac massage was required and again anesthesia resuscitation continued. She did become stable enough at this point to close her chest in routine fashion. Two chest tubes were placed. The patient was now considered stable and she was transported to the Intensive Care Unit in critical condition.

Dr. Jones testified that he did not know when the tourniquet on the patient's right femoral artery became loose. He stated:

> To my knowledge, and again, reviewing of her records, it appears to me that it became loosened probably at the end of the procedure, towards the end of the procedure, the initial mitral valve and tricuspid valve repair. I don't think – I think it would only be speculation as to say it was 30 minutes into the operation, an hour and a half into the operation, I can only speculate. So I think it would be fair for me to speculate what time that happened.

He stated that he learned about the loosened tourniquet from the surgical staff but could not recall at what stage of the surgery this occurred.

Dr. Jones admitted that there was bleeding at the cannulated right femoral artery during the eighty-two-minute robotic procedure, but he claimed that this was a common occurrence. He stated that there would have been a lot of bleeding at the start of the procedure when he opened the groin and cannulated the right femoral artery, and it was not uncommon for blood to pool on the floor during this type of surgery. Dr. Jones testified that the amount of blood loss experienced during surgery varies with every patient and there was no way to determine the exact amount of blood lost by the patient during the procedure. He further stated that morbidly obese patients have a greater body mass and require more blood than leaner patients.

In his operative report, Dr. Jones stated that the patient "lost [a] significant amount of blood from her right femoral artery during the procedure." When asked what he meant by "significant," he stated that the term was subjective, but that he could not recall whether his use of the term referred to the size of the blood pool adjacent to the patient's groin or her hemodynamics. However, Dr. Jones testified that based on his review of the patient's profusion records, he found nothing to indicate that the patient was hemodynamically compromised during the procedure. Although he never saw the blood pooled on the operating room floor, he said that this was a common occurrence in these procedures.

Ms. Falconer, a three-year board-certified perfusionist at the time of the procedure, explained that in order for cardiopulmonary bypass to work, the bypass machine has to maintain a certain level of volume;[2] otherwise, there is a risk of pushing air into the patient. In describing the process, she stated that volume circulates from the patient, into the bypass machine, and then back to the patient.

---

[2] In his report, Dr. Traylor described the volume transfused to the patient during the procedure as packed red blood cells, reclaimed cell saver blood, platelets, fresh frozen plasma, and various intravascular fluids.

19

Ms. Falconer testified that volume was first added to the bypass machine at 1149, when she added two units of Plasma-Lyte A. She explained that volume is routinely added to the bypass machine in order to offset the patient's loss of volume from leaking blood vessels. She stated that the addition of volume decreases this leaking by controlling the oncotic pressure[3] in the blood vessels. Ms. Falconer testified that the anesthesia records indicated that the patient was losing volume at 1403, 1408, 1413, 1414, 1415, and 1420 hours. When that occurred, she stated:

> At this point in time, this – the records would be very indicative that there is some sort of volume loss happening to the patient. And, again, I would have expressed my concern and expressed that I believed that there was some sort of bleeding going on with the patient because, as you said, the first bypass run did not require this volume, and the second bypass run did so . . . And I would have had that discussion with Dr. Jones and Dr. Ackal to be allowed to give that much blood product.

She stated that every time she added blood to the bypass machine she did so only after obtaining permission from Dr. Jones.

Ms. Falconer testified that she first learned about the excessive bleeding at 1527 hours, when she saw blood on the drapes after the patient was weaned off of bypass. When asked if there was discussion amongst the surgical staff regarding the source of the patient's bleeding, Ms. Falconer testified:

> I believe that after things had been addressed and the blood had been seen that there was a general consensus that, yes, something – you know, when we're discussing – when we're – when myself especially is telling the surgeons that I'm – the surgeon that I'm seeing that there must be bleeding coming from somewhere based on my volume status that it's – that I felt like that I had been redeemed in knowing that there had been something going on. At the end of the case, I think everybody kind of felt that way too, Okay [sic], there had been something going on. We weren't imagining it, we weren't creating it, that there was something that had gone on.

She further denied that she felt the matter was handled improperly, stating:

---

[3] The force that tends to counterbalance the capillary pressure. The capillary pressure forces fluid out of the blood vessels, while the oncotic pressure encourages fluid into the blood vessels.

20

No. I think things happen in surgery. We see it as the problem was fixed ultimately. I know while she was on bypass she was adequately perfused. I know that my responsibility in what I do every day in going into cases was appropriate for this case. At the end of the case, she left the operating room alive[.]

Mr. Duhon, the scrub technician, testified that he noticed blood leaking from the patient's cannulated right femoral artery onto the drape and floor during the first cardiopulmonary bypass run. Although he described the leakage as slight, he testified, "It wasn't profuse at all. Generally in these cases there is leakage. It was leaking, just apparently more than what I had took as normal." He said that he thought the leakage was more than normal "[b]ecause I've never done a case where there was that much blood accumulated on the floor."

Mr. Duhon testified that instead of notifying someone about the bleeding, he "just said aloud that I thought there was more blood loss than normal." He did not recall there being any response to his comment. He stated that at one point, Mr. Dunn asked him if there was blood loss at the patient's groin, to which he responded in the affirmative. While Mr. Duhon was not completely sure if everyone in the room was aware of the bleeding, he stated, "There was an open discussion that there was blood loss. I mean it's hard for me to assume what everybody in the room knew. It was out loud." He continued, "I'm just saying that the fact that there was blood loss at the groin was said aloud more than once. So I just – I can assume that everybody knows but I'm not completely sure." He could not recall whether the bleeding was addressed by Ms. Reilly or Ms. Conner during the first bypass run.

Ms. Reilly, a registered nurse (RN), who was positioned at the surgical field, testified that she was aware of the blood on the operating room floor, but that she did not find the amount excessive as compared to bleeding from other cases. She stated that at one point during the procedure, she, Mr. Duhon, and Ms. Conner asked Dr. Jones to check the femoral cannulation site because "there was a little bleeding

and we were suctioning a lot." She stated that Dr. Jones walked over to the operating table, looked at the site, and then walked back to the console and said, "We will just - - You know, we will deal with it later."

Ms. Reilly testified that Dr. Jones did not address the bleeding until after he finished the robotic procedure and began to decannulate the artery. She said that in addition to the two heart-valve repairs, Dr. Jones also performed a femoral endarterectomy[4] and put a graft in the femoral artery. Ms. Reilly did not recall when she first noticed the blood or when Dr. Jones inspected the femoral artery. She stated that in her job, she has "to address the doctor if there is any question that I have about anything that is going on in any surgical procedure."

Ms. Conner, a nurse practitioner and Dr. Jones' assistant, testified that she was located towards the patient's head at the operating table, and Dr. Jones was located at the robotic console in the corner of the room. She stated that she did not see the blood on the floor, but that someone reported that blood was falling out of the drape at some point during the procedure. She said that she and the surgical staff immediately searched the operative field and located the bleeding, which she described as a slow leak from around the cannula inserted in the right femoral artery. She explained that in order to place the patient on cardiopulmonary bypass, Dr. Jones inserted cannulas into the patient's femoral artery and femoral vein at the start of the procedure.

Ms. Conner testified that she, Ms. Reilly, and Mr. Duhon informed Dr. Jones about the leak, after which he walked over to the operating table and inspected the femoral artery. She stated that he then walked back to the robotic console and

---

[4] An endarterectomy is the excision of thickened atheromatous areas of the inner-most coat of an artery. Atheroma is a mass or plaque of degenerated thickened arterial intima. Intima is the inner-most part of the vein.

22

continued the procedure. Although she did not recall his exact response, she said "we were all under – I was under the impression that he was going to – not going to do anything at that time about it."

Ms. Conner testified that bleeding was mentioned a second time during the robotic procedure, when someone stated that blood was running down to the floor. She admitted that Dr. Jones did not leave the robotic console to inspect the bleeding on this occasion. She stated that she later concluded that the patient had lost a significant amount of blood during the surgery based on "the discussions about the blood being on the floor, perfusion saying the blood was on the floor and the nurse and, I guess the amount of blood that was on the floor that was leaking from the drapes."

Mr. Deshotel, the relief circulator nurse, testified that he noticed a lot of blood on the operating room at 1410 hours, when he entered the room with blood requested for the surgery. He stated that he was concerned because "there was blood on the floor and that it was - - it was coming from somewheres [sic]. I mean, I was worried that I'm getting blood, we are giving blood and there is blood coming on the floor." When asked if he notified anyone about the blood, Mr. Deshotel testified:

> When I walked in I asked Jon, I said, "Hey Jon", I said, "look, there is blood on the floor. What is" - - I said, "What about that?" He said, "Dr. Jones is aware of it". He said, "We have told him and - - and we are not going to say any more about it", he says, "because we have told him several times", he told me, "and because we don't want to add stress to the situation".

He then stated, "What I remember when I walked in and - - I don't remember exactly what he told me." He said, "I remember I said, 'Hey, look, there is blood on the floor'. And he - - And he said that Dr. Jones has been notified about it."

Mr. Dunn, the nurse anesthetist, testified that he, Mr. Duhon, Ms. Reilly, and Ms. Conner all noted and discussed the fact that there was more than normal bleeding

23

from the patient's femoral artery during the first bypass run. He stated that he reported to Dr. Ackal that the patient's hematocrit had dropped so they assessed her lab values. He said that although they were not excessively low, Dr. Ackal decided to give the patient two units of packed red blood cells. He stated that Dr. Jones was informed of this decision, and the patient's lab values returned to acceptable levels once the blood was administered. He did not recall that anything was done to address the bleeding after the two units of blood were added to the bypass machine.

Mr. Dunn testified that he did not document or mention the first time he noticed blood on the floor because he felt that it was common knowledge from the first bypass run. He stated that when he reports blood loss to the surgeon or the anesthesiologist, he does so only to inform them of the fact that there is blood loss. He said that the decision to address the bleeding rests with them.

Dr. Todd Ackal, an anesthesiologist, testified that the patient was placed back on pulmonary bypass at 1356 hours due to her inadequate hemodynamics.[5] He stated that there was a lot of discussion between the surgical staff during the second bypass run. During that time, he stated that he and Mr. Dunn were trying to improve the patient's blood pressure and heart function, as well as running tests and assessing her vital signs.

Dr. Ackal testified that "the first time that I can recall that a definitive site of blood loss was identified is when they removed the surgical drapes and there was just a large volume of blood underneath the drapes[.]" He stated that he never saw blood leaking from the patient during the procedure, but that he saw a large amount of blood on the operating table and the floor afterwards, when the drapes were removed. Dr. Ackal testified that the blood on the operating table had coagulated or

---

[5] Movement of the blood.

24

clotted. He stated, "So the inference to me is it is a significant volume when you start to have pooling of blood and then it clots, which is the normal response."

Dr. Ackal testified that there was discussion about the amount of blood on the operating table:

> I think there was – You know, as I recall, there was discussion about it and that there was the – I don't think anybody – I did not infer during the case that that volume was blood [sic] was coming out of the patient from underneath the drapes.
>
> . . . .
>
> I know we were dealing with blood loss and we were transfusing blood frequently and at times during the case we don't typically, and then every time we would check her blood count it was about the same. You know, we give volume of blood and we would still have the same blood count. So it fit as I started to put it together in my mind, but I was – I was taken back [sic] a little bit by the volume of blood under the drape and on the floor –
>
> . . . .
>
> – that we could not appreciate. That I saw.

Dr. Ackal testified that neither he nor Mr. Dunn knew the source of the bleeding when the patient was weaned off the bypass machine the second time. He thought that whoever identified the patient's bleeding should have informed everyone in the operating room, even if the surgeon was aware of the problem. He said that he wished someone had given him an idea as to why the patient's blood volume was dropping:

> Q.    Okay. Is anybody giving you any idea?
>
> A.    No, sir. I mean, and again, you go back to the patient, the profile. It is going to be – It is a double valve case so it's – You know, I'm at this point probably saying, okay, we couldn't separate the first time what was going on. You know, we are requiring a lot of blood. Is there blood loss. It was entertained in the room, was there blood loss. Nothing was identified. Now we put her on additional iatropic support. I think – I think the surgeon during this time was just trying to confirm all the things I just described to you. Is there a site, is there something that I need to address? I had the echocardiogram machine that I'm looking at, I'm

25

> looking at the heart screen, I'm looking at the valve function, I'm assessing for the wall motion. Are they abnormal or is it normal, is the valve repair replacement – Is it adequate[.]

Dr. Khan, a thoracic surgeon and a member of the second medical review panel, testified that it was not easy to determine when the patient's excessive bleeding started based on Dr. Jones' post-operative report, which he described as incomplete due to Dr. Jones's failure to include the endarterectomy in the report. He stated that initially, the patient's bleeding was not pronounced, but that it became more pronounced towards the end of the procedure. However, Dr. Khan testified that bleeding is common in cardiac surgeries and begins at the first incision. He further stated that leaking or bleeding from a cannulated femoral artery is common, occurs in every single operation, and depends on the stage of the surgery and the issues arising therein.

Dr. Khan testified that it was irrelevant when Dr. Jones was informed about the excessive bleeding because he knew about it and decided it was more important to proceed with the heart-valve replacements than address the bleeding. He stated that a surgeon applies a triage system during surgery, deciding which issue to address based on its importance. He said that "while the heart was stopped, I'm dealing with the heart and go to the bleeding because that's manageable and that's fixable."

Dr. Khan agreed that "doctors and hospitals have a duty to ensure that medical procedures are done safely and that they are appropriately staffed[.]" He further agreed that "medical personnel should be available to correct known complications during the surgery[]" and that "bleeding from the body should be stopped as soon as possible[.]" Dr. Khan described as vague the question of whether it was the surgeon's responsibility to address issues of bleeding during surgery. He explained that the situation at hand determines who addresses bleeding:

26

It depends on what the situation is. I gave you an example of a bypass operation yesterday. We take the vein out, bleeding occurs from there. The PA deals with it. I'm too busy in the chest dealing with that part. So it just depends on what the situation is and what the operation is and what portion of the operation is going on.

. . . .

. . . Or sometimes a nurse will put pressure on it or if it's too much bleeding, for instance, in a radial artery that was placed by the anesthesiologist, they will come take care of it.

Dr. Khan further stated that it was vague to ask whether the patient's bleeding during the procedure was acceptable or unacceptable. He stated that it was normal for the patient to bleed from her femoral artery because it was calcified, but that the artery obviously bled more than normal because Dr. Jones had to repair it. He further stated that there is no acceptable or unacceptable rate of blood loss from the femoral artery for a patient undergoing this type of procedure. Nevertheless, he admitted that zero blood loss would be ideal.

Dr. Khan admitted that the patient arrested during the surgery but stated that this is common during heart surgery, just like bleeding. He further surmised that Dr. Jones opened the patient's chest at 1600 hours in order to "get better control proximally" because the femoral artery was "basically getting shredded apart because the artery was so bad." He assumed that Dr. Jones "opened the chest to put her on bypass through there because he can't go through on bypass through the same femoral artery."

Dr. Khan testified that Dr. Jones chose not to address the bleeding once he completed the robotic procedure because he was still worried about the patient's heart. He stated that unless the femoral artery becomes a problem, "it's like a complete afterthought." He said that the femoral artery would become a problem, "[i]f it falls apart and it's bleeding out and the patient is dying from it." He stated

27

that when this occurs, "[t]he patient arrests and that's when you open the chest to try to fix that problem and put him on the heart/lung machine."

Dr. Khan could point to nowhere in the medical records to establish that Dr. Jones attempted a femoral artery repair immediately after he finished the robotic procedure. He stated, "You're asking me to grab straws out of the sky[,]" and "the "operative report leaves a lot to be desired for."

> There's not adequate things in the operative report. But what I'm assuming happened is he tried to fix the femoral artery. It broke down. He could not get proximal control. At that point, the bleeding was significant enough where he had –
>
> . . . .
>
> . . . Where he had to go to the chest and to gain access there in order to put the patient on bypass to save her life.
>
> . . . .
>
> He was – so the femoral artery – this is probably what happened. The femoral artery is a bad artery. Okay. It's known to be bad because the peripheral vascular disease the patient had, which we knew. He knew that, too. He still cannulated it in order to gain access for the coronary bypass system. Now because it's a bad artery and he's on bypass, it's going to leak. The whole case is going to leak. You can't do anything about it, but kind of deal with it and adjust for it. Okay. So it bleeds the whole time. He finishes the chest. He finishes the heart operation. Closes up there and then says let me go down to the artery and try to fix this problem. So when you go to the artery you decannulate, which is naturally taking out the cannulus for the balloon pump – I mean, for the coronary bypass system. Take all that out and then try to repair the artery.
>
> At that point, when there's a hole in the artery you naturally think of a tube with a hole in it. You have to gain control here, control here, and then close it up. Artery is so bad and it's so rocky that he can't close it up and this clamp over here is not holding the bleeding coming from there because the clamp can't clamp across calcium and rock.
>
> At that point, he loses control of this artery. Okay. Then he – bleeding occurs, so he holds pressure or whatever they do to control pressure here and goes to the chest. Opens up to put the patient back on bypass so that they can gain blood flow back so that the flow to the head and then come back and fix the artery. And that's probably what happened.

28

Although Dr. Khan stated that it was common for a perfusionist to experience difficulties in maintaining adequate volume and flow rates, he admitted that this difficulty presented a complication during surgery. He further stated that it was common for a tourniquet to loosen from around a cannula during cardiac surgery, with the result that the patient experienced blood loss.

Dr. Khan admitted that he did not review all of the evidence submitted by the DeHarts to the second medical review panel, including Dr. Engleman's report and a map of the patient's flow rates during the procedure. He stated, "The panel was so thick that I'd be sitting there until two months reading it." When discussing Dr. Engleman's expertise, Dr. Khan testified:

A.  So does he do any minimally invasive? Who – where –

Q.  Yes. He does minimally invasive. But – now we could quibble on terms all day long. I don't want to do that with you. I just wanted to ask you about –

A.  This whole deposition seems like it's quibbling on terms and time periods and all that other stuff. So we have to go – I mean, I'm trying to explain to you that he's thinking of it from – if you sat – I'll give you a perfect example of the person in our –

Q.  I understand.

A.  – medical review panel. What was his name? I don't even know what his name was. What was the other guy's name who was with –

Q.  Mousset.

A.  Mousset. He didn't agree with the thing.

Q.  What's that?

A.  He sat there and said that this was wrong, but –

Q.  What do you mean he said this was wrong?

A.  He sat there and said initially that he didn't agree with the whole operation. Just like Dr. Engleman did.

Q.  Okay.

29

A. But if you sit down and explain to any sane cardiac surgeon that this is what happened, explain to them the thing, they will all agree, yes, there's nothing that was done out of the ordinary.

Dr. Engleman, a thoracic surgeon, opined that Dr. Jones breached the applicable standard of care in several instances, including his failure to appreciate and timely address the extent of the patient's blood loss from the groin cannulation site. He stated that the medical records indicated that the perfusionist was having volume problems throughout the initial two-hour bypass run. Although he admitted that the patient's vital signs were never critical during that time, he stated that it is possible to maintain adequate blood pressure levels with inadequate volume. Dr. Engleman testified that it was his recollection that the patient was transfused more than eleven units of red blood cells while in the operating room. He stated that he was most concerned with the documented amount of cell saver drainage, which he said was too high and inconsistent with the patient achieving a good recovery from cardiopulmonary bypass.

Although Dr. Engleman did not have an opinion as to whether the perfusionist or the surgical staff breached the standard of care, he stated, "I'm concerned that for whatever reason there was a loss of communication and situational awareness during this procedure regarding acute blood loss. It is not clear to me, you know, how that happened, but I am concerned that it occurred for the entire team." He further stated that he was concerned that the perfusionist "may not have been aware of the extent of blood loss potentially of no fault of her own." Dr. Engleman further agreed that the perfusionist and surgical staff cannot "do anything to stop the bleeding without the permission or the guidance of the surgeon."

In his report, Mr. Stammers stated that perfusionists are required to provide safe and competent care in the administration of cardiopulmonary bypass, under the direction of physicians such as cardiac surgeons and anesthesiologist. He stated that

30

perfusionists administer care based upon directives from "1. Guidelines published by professional societies, 2. Peer-reviewed published papers that comprise the foundation for evidence based data, 3. Local protocols from Policy and Procedure manuals at the hospitals that employ the perfusionists, and 4. Knowledge from personal experiential backgrounds." He further stated that the cardiac team, which includes the perfusionist, "is charged with managing all aspects of care provided to patients[]" and that "[i]t is the responsibility of the entire cardiac team to voice any deviations from expected protocol so that corrective actions could be promptly taken to assure patient safety and reduce the risk of harm."

In reviewing the patient's robotic surgery, Mr. Stammers determined that Ms. Falconer breached the standard of care by failing to document the patient's calculated flow rates. He stated:

> There were no identifiable calculated flow rates seen on any perfusion record for the patient. The flow rates are calculated to guide the conduct of [the perfusionist] providing perfusion to sustain life and prevent injury that arises by hypoperfusion and associated flow related phenomena. The perfusionist uses these flows to assure adequate cardiopulmonary bypass is provided.

He further determined that the calculated flow rate for the patient was 3.6 to 4.8 liters per minute and that Ms. Falconer failed to provide adequate perfusion to the patient for significant periods of time during the surgery.

Mr. Stammers stated that Ms. Falconer further breached the standard of care by failing to measure or record standard clinical values during bypass, including arterial blood pressure, system line pressure, arterial blood gases (either continuously or every twenty to thirty minutes), and cardioplegia solution temperature. He stated that she further failed to timely record (every thirty minutes) the results of a test used to assess coagulation of the patient's blood following the administration of heparin during cardiopulmonary. He also stated that the "use of

31

the volume expander (Hespan®) resulted in the excessive intra and postoperative bleeding that contributed to the coagulopathy[6] and significant transfusion of blood products."

Mr. Stammers stated that as a member of the cardiac team, Ms. Falconer also breached the standard of care by failing to inform the surgeon and the surgical team "that volume was being lost during the cardiopulmonary bypass period, which would have required an immediate evaluation of the situation to seek the source of volume loss and identify the exsanguination[7] from the cannula in the groin."

As to causation, Mr. Stammers stated Ms. Falconer's failure to provide adequate perfusion during cardiopulmonary bypass caused the patient's low blood flow rates and subsequent metabolic acidosis.[8] He stated that the bleeding at the femoral cannula site likely caused a decrease in the amount of blood held in the bypass machine's venous reservoir, which, in turn, led to the patient's low blood flow during bypass. Mr. Stammers stated that the patient suffered a significant loss of blood once she was weaned from the bypass machine, "which resulted in 2.5 liters of mediastinal shed blood being processed through the autotransfusion machine (Cell Saver)." He stated that the processed blood would have further exacerbated the patient's bleeding "by inducing a dilutional coagulopathy caused by the loss of soluble clotting factors and platelets."

Ms. McDonald, a registered nurse (RN), is an expert in perioperative services, standards of nursing practice, AORN (Association of periOperative Registered

---

[6] Inability of the blood to coagulate.

[7] Draining of blood.

[8] Accumulation of acid.

Nurses) standards, and Joint Commission Standards.[9] She outlined the standard of care appliable to RNs in her report and deposition and determined that the surgical staff RNs breached the standard of care, as follows:

> The RN circulator is in charge of the room and serves at all times as a patient advocate. The Association of periOperating Room Nurses (AORN) states that "in the operating room, patients are powerless to make decisions on their own behalf. The circulating nurse serves as the patient advocate while the patient is least able to care for themselves." The RN circulator ensures the patient's safety during this period of vulnerability. The Perioperative RN has the responsibility to plan and direct care for their patients. The circulating RN duties include thorough patient assessment, diagnosis, outcome identification, planning, implementation and evaluation. The RN is often the single patient advocate for the patient's safety during the surgery. The circulating RN must use sound nursing judgment, critical thinking skills, and communication skills.
>
> The RNs involved in the care of Ms. Dehart [sic] failed to function as her patient advocate. Once the "unusual bleeding" was noticed the RN circulator had a duty to seek assistance. A call should have been placed to the charge nurse, manager or perioperative director. If there was still no resolution, a call to the Chief of Surgery and administration would be the next steps. This is the usual and customary procedure. The OR policy and procedure manual, table of contents has a policy II.A.4 "Chain of Command" it is under the HR section. It would be helpful to review this policy. (I did not see it in the provided documents.)

(Footnote and exhibit page cite omitted.)

Ms. McDonald determined that the surgical staff violated the following policies contained in LGMC's Operating Room Procedure Manual: 1) II: A-3, which describes the duties of circulator nurses in the operating room, and states that they are the patient's advocate and are responsible for the safety and welfare of the conscious or unconscious patient and for communicating with anesthesia and the surgeon for any significant physical or emotional needs; 2) III: 1, which requires effective communication of all issues related to patient care and maintains lines of

---

[9] The Joint Commission describes itself as "the nation's oldest and largest standards-setting and accrediting body in health care." The Joint Commission, (Oct. 20, 2020, 2:42 PM) https://www.jointcommission.org/about-us/facts-about-the-joint-commission/. Pursuant to LAC 48:I.6701(A), pertaining to the licensing and certification of hospitals, "accredited" is defined as "approval by the Joint Commission on Accreditation of Hospitals.

communication between all departments, directors, and administrative staff; 3) VI: B-1, which requires the hospital administrator and chief of surgery to be notified about "any event that deviates from normal operations or appears to lead to a potentially hazardous situation[.]" She further determined that the relief circulator RN violated LGMC's Handoff Communication policy by failing to discuss the "criticality of this case, bleeding from the femoral artery, the need for blood transfusions, vital signs, and intake and output[.]"

Ms. McDonald further determined that LGMC violated the Joint Commission standards LD.3.60 and LD.3.90, regarding effective communication throughout the hospital by its failure to implement policies and procedures relating to timely communication of patient care issues by hospital staff and by failing to "ensure that all team members are proficient in effective communication to provide a culture of patient safety." She also determined that the surgical staff failed to comply with the Joint Commission standard PC.2.150, which requires patients to be reassessed as needed. She stated that although the patient's condition changed during her procedure, the surgical staff failed to reassess her and take appropriate action.

In summation, Ms. McDonald stated that it was her opinion "based on a reasonable degree of administrative and clinical certainty, based on the documents provided that the standards of care and hospital policies were not followed. These failed actions were a precursor to Ms. Dehart's [sic] tumultuous post-operative course and resulting death."

Ms. McDonald reiterated the perioperative RN standard of care in her deposition and testified that AORN has well-defined standards of care relative to communication by nurses on patient care issues. She stated that an RN is only required to seek assistance outside of the operating room when a patient is bleeding

34

if the surgeon fails to address the bleeding, ignores the RN's conversation regarding the bleeding, and the RN feels that the patient's safety is compromised.

In this instance, Ms. McDonald testified that the only manner in which the surgical staff could address the patient's bleeding was by informing the surgeon about the bleeding and about the amount of blood that was on the floor. She stated that the surgical staff complied with the first duty when they informed Dr. Jones about the bleeding after Mr. Duhon noticed the blood dripping on the floor. However, she opined that Mr. Deshotel, the relieving circulator RN, breached his duty of seeking assistance outside of the operating room after he saw the blood puddled on the floor and learned that Dr. Jones knew about the bleeding but that none of the staff were going to mention it to him again. Ms. McDonald testified:

> I don't know if there was a culture of fear in the room, meaning they feared the surgeon and didn't want to bring it up again because he was going to holler and scream or throw something. I don't know that. I don't know whether they brought it to him multiple times, because the documentation is poor. Did they bring it to him multiple times and he chose, or maybe they didn't bring it to him multiple times and he was unaware of the extent of the bleeding. I don't know the answers to those questions.

> However, if you see a lot of bleeding like that on the floor and the doctor's not addressing it, that's the time I would have sent it out the door.

Ms. McDonald testified that she also felt that Ms. Reilly, an RN, could have provided an opinion on the bleeding that Dr. Jones would have respected because she was over the cardiovascular line during the surgery. She said that "ultimately, the control of the room and the communication and the safety of the patient belongs with the circulators." However, she felt that the leadership of LGMC also breached their standard of care by failing to implement training and ensuring that a culture of safety existed in the hospital.

35

Ms. McDonald testified that the duty to ensure the Rummel tourniquet is properly secured and the decision of when to address a leaking cannula rests with the surgeon. She stated that the duty of adjusting the tourniquet during surgery also rests with the surgeon, and his assistant, if properly trained and supervised. However, she stated that the surgical staff could pack the site of the bleeding with sponges or put in place a suction catheter. She further said that she was not offering opinions as to the perfusionist or the nurse practitioner.

Ms. McDonald acknowledged that cannulation is used in all cardiopulmonary bypass surgeries, whether or not robotic, and that there is a risk of loosened tourniquets and leaking cannulas in these surgeries. She agreed that bleeding occurs in every surgery. Ms. McDonald further admitted that the patient had preexisting comorbid conditions, including diabetes, anemia, chest pain, hypertension, and a leg amputation.

Ms. McDonald testified that it was her opinion that the circulator RNs' failure to report the amount of bleeding contributed to the patient's outcome. She stated:

> Yes. I do believe – again, I'm just speaking as a nurse. I would like, you know, from my, from my years of experience and running an operating room and dealing with all kinds of surgeries, hypovolemia[10] can cause a number of problems. And this patient was already, had lots of comorbid conditions, as we've already discussed. So for her to have that amount of hypovolemia and it not being addressed adequately enough, I think it led to her rocky postoperative – well, she coded in the OR, they had to open up her chest. I believe those were all due to the amount of bleeding not being addressed in a timely manner. And I believe the circulators in that room had a duty to report and did not.

> Ms. McDonald testified that she was involved in approximately five surgeries where, as operating room director, she referred a problem up the chain of command to administration. In one case, she said that she called her administrator and the chief of surgery after a surgeon, who was performing a laparoscopic hysterectomy, refused help even though the patient was bleeding, and the procedure was taking longer than normal. Ms. McDonald testified that she called the chief of surgery in a second case when a patient undergoing an abdominal aortic aneurysm

---

[10] Abnormally decreased volume of circulating blood in the body.

repair was obviously bleeding out and the surgeon chose only to pack the bleeding.

Mr. Hawkins is a board-certified healthcare safety professional and hospital administration executive from the State of Florida. In his report, he stated that he is an expert in hospital administrative standards, the duties and responsibilities of hospital chief executive officers (CEOs), and the national community standards for all acute care hospitals as promulgated by the Joint Commission and the Center for Medicare and Medicaid Services (CMS) Conditions for Participation.

Mr. Hawkins offered six expert opinions "to a reasonable degree of administrative certainty[,]" as follows: 1) LGMC's chief executive officer (CEO) failed to foster an environment of patient safety and advocacy as evidenced by the surgical staff's failure to escalate the excessive bleeding up the chain of command in compliance with LGMC's own policy; 2) Pursuant to 42 C.F.R. § 482.12(e),[11] LGMC is responsible for Dr. Jones' negligence even though his services were contracted through a separate corporation; 3) LGMC's CEO and governing board would be guilty of negligent credentialing if they granted privileges to Dr. Jones and Ms. Conner without verifying that they met the privileging criteria; 4) LGMC's surgical staff failed to obtain a complete informed consent from the patient prior to surgery because sections of the informed consent form informing the patient of additional risks caused by her underlying medical conditions and reasonable

---

[11] 42 C.F.R. § 482.12(e) provides:

*Standard: Contracted services.* The governing body must be responsible for services furnished in the hospital whether or not they are furnished under contracts. The governing body must ensure that a contractor of services (including one for shared services and joint ventures) furnishes services that permit the hospital to comply with all applicable conditions of participation and standards for the contracted services.

(1) The governing body must ensure that the services performed under a contract are provided in a safe and effective manner.

(2) The hospital must maintain a list of all contracted services, including the scope and nature of the services provided.

37

therapeutic alternatives and their associated risks were left blank, contrary to LGMC's policy, as well as Joint Commission and CMS Conditions of Participation standards; 5) LGMC violated the Joint Commission's staffing standards by its failure to comply with its own protocol requiring two perfusionists for the patient's robotic case; and 6) Based on Mr. Stammers' report, LGMC was negligent in failing to properly supervise Ms. Falconer.

In his July 13, 2017 affidavit, Dr. Traylor, a board certified anatomic and forensic pathologist, stated that it was his opinion "[w]ithin a reasonable degree of medical certainty that had the hemorrhage at the femoral artery cannula site been addressed in a more timely fashion that the complications and ultimate death of Mrs. A. Dehart [sic] would most likely not have occurred." In his June 21, 2018 affidavit, he explained that "the field of Forensic Pathology is the medical study of causation as it relates to injury or death of humans[,]" and as an anatomic and forensic pathologist, it is his "duty to determine the cause and manner of death."

In his report,[12] Dr. Traylor estimated that prior to the surgery, the patient's whole blood volume equaled 5,902 mL, and her red blood cell mass equaled 1,753 mL. Based on the anesthesia records, he determined that the patient was transfused a total of 25,198 mL of volume during the surgery, the majority of it occurring between 1330 and 1650 hours. Dr. Traylor further determined that based on the 5,150 mL of blood hemorrhaged by the patient and reclaimed by the cell saver machine, she lost 87% of her whole blood volume and 70% of her red blood cell mass between 1330 and 1407 hours.

---

[12] This January 23, 2015 report is a revised version of Dr. Traylor's July 2, 2013 report and was attached to both affidavits. However, the fifth page of the report contains Dr. Traylor's calculations from his July 2, 2013 report. A copy of this report, with the correct fifth page, was introduced by the DeHarts in support of their October 15, 2018 opposition to Dr. Jones' September 25, 2018 motion for summary judgment. Accordingly, we will include the original and revised findings from the fifth page, with the revised findings in brackets.

38

On the fifth page of his report, Dr. Traylor calculated that the patient's red blood cell mass was replaced 2.47 [2.76] times, and her whole blood volume was replaced 3.6 [4.26] times. Based on the patient's hematocrit and her calculated red blood cell mass lost during surgery, Dr. Traylor determined that the patient hemorrhaged 9,342 [11,138] mL of whole blood during the surgery. He stated that this would have been the blood that soaked the drapes and pooled on the operating room floor during the surgery.

With regard to Mrs. DeHart's cause of death, Dr. Traylor further stated:

The intraoperative hypotension was the direct result of the intraoperative hemorrhage resulting in ischemia to the kidney tubules causing acute tubular necrosis. Mrs. A. Dehart [sic] became progressively oliguric with creatinine and blood urea nitrogen levels trending upward, was third-spacing fluids (body weights ranging from a low of 251 lb to a high of 274 lb [admission body weight 200 lb] and blood natriuretic peptide of 2890 on 10/6/2008) and ultimately required a catheter placement for dialysis. It is my opinion with a reasonable degree of medical certainty that had the hemorrhage at the femoral artery cannula site been addressed in a more timely fashion that the complications and ultimate death of Mrs. A. Dehart [sic] would most likely not have occurred.

LGMC's 2008 Operating Room Procedure Manual[13] outlined the duties of the circulating nurse, as follows:

The circulating nurse is primarily responsible for the safety and welfare of the conscious or unconscious patient. The patient must be the center of everyone's attention. The role of the nurse is truly that of patient advocate. The circulating nurse demonstrates nursing skills and exercises judgment in giving or delegating nursing care to the physical, spiritual, and psychological needs of the patient. The nurse directs and assist in carrying out procedures as adopted by the department aided by his/her knowledge of basic science, psychology, interpersonal skills, and nursing knowledge.

Two of the thirty-seven tasks outlined in the circulating nurse's duties require the circulating nurse to "[c]ommunicate with anesthesia and surgeon for any significant

---

[13] The exhibit was produced by the defendants in response to the DeHarts' second set of interrogatories and request for production of documents.

physical or emotional needs[,] and "[m]aintain a high level of awareness for the needs of both the patient and the surgeon." In response to the DeHarts' fifth set of interrogatories and requests for the production of documents, the defendants admitted that LGMC's surgical department did not have a chain of command policy and procedure in 2008, and that this policy was not created until January 2010.

In *Independent Fire Insurance*, 755 So.2d at 236 (first and fourth alterations in original), the supreme court, in reversing prior jurisprudence finding expert opinion evidence inadmissible in summary judgment proceedings, reinforced "several important underlying principles" with regard to the summary judgment hearings:

> The first is that the trial judge cannot make credibility determinations on a motion for summary judgment. *See Sportsman Store of Lake Charles, Inc. v. Sonitrol Security Systems of Calcasieu, Inc.*, 99-C-0201, p. 6 (La.10/19/99), 748 So.2d 417 ("[t]he rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony"); [Frank L. Maraist and Harry T. Lemmon, 1 LOUISIANA CIVIL LAW TREATISE, CIVIL PROCEDURE, § 6.8,] p. 145 [(1999)] ("[i]n deciding a motion for summary judgment, the court must assume that all of the affiants are credible . . ."). Second, the court must not attempt to evaluate the persuasiveness of competing scientific studies. In performing its gatekeeping analysis at the summary judgment stage, the court must "focus solely on the principles and methodology, not on the conclusions they generate." *Daubert [v. Merrell Dow Pharm., Inc.*, 509 U.S. 579,] 595, n. 6, 113 S.Ct. 2786 [(1993)]. Third, the court "must draw those inferences from the undisputed facts which are most favorable to the party opposing the motion." Maraist & Lemmon, *supra*, p. 145. Fourth, and most importantly, summary judgments deprive the litigants of the opportunity to present their evidence to a jury and should be granted only when the evidence presented at the motion for summary judgment establishes that there is no genuine issue of material fact in dispute. If a party submits expert opinion evidence in opposition to a motion for summary judgment that would be admissible under *Daubert-[State v.] Foret[*, 628 So.2d 1116 (La.1993)] and the other applicable evidentiary rules, and is sufficient to allow a reasonable juror to conclude that the expert's opinion on a material fact more likely than not is true, the trial judge should deny the motion and let the issue be decided at trial.

After performing a *de novo* review of the record, we find that the DeHarts established the standard of care applicable to Ms. Falconer and the surgical staff involved in the patient's September 30, 2008 surgery.

Based on the evidence, it is clear that knowledge of the excessive bleeding originated with the surgical staff, rather than Ms. Falconer. In fact, Ms. Falconer testified that she was not aware of the bleeding until 1527 hours, after the patient was weaned from the cardiopulmonary bypass machine.

Although the defendants objected to Mr. Stammers' opinion evidence, the trial court ruled that the evidence was admissible, and the defendants did not appeal that ruling. After reviewing the DeHarts' evidence in accordance with the principles laid out by the supreme court in *Independent Fire Insurance*, we find that Mr. Stammers' opinion evidence is sufficient to allow a reasonable juror to conclude that his opinion with regard to Ms. Falconer's breach of the standard of care is more likely than not true. Accordingly, we find that a genuine issue of material fact exists with regard to whether Ms. Falconer failed to adequately document the ongoing cardiopulmonary bypass and whether this failure caused her to provide inadequate perfusion during the robotic procedure. We further find that a genuine issue of material fact exists with regard to whether Ms. Falconer failed to timely inform Dr. Jones and the surgical staff that the patient was losing volume during the first bypass run.

With regard to the surgical staff, we further find that a reasonable juror could conclude that Ms. McDonald's opinion evidence regarding the surgical staff's breach of the standard of care is more likely than not true. According to the defendants' evidence, Dr. Jones testified that after inspecting the bleeding, he ordered the site packed with lap pads. However, not one of the surgical staff mentioned this in their testimonies. According to Ms. Reilly and Ms. Conner, Dr.

41

Jones walked from the console to the operating table, inspected the site, walked back to the console, and stated that he would address the issue later. Further, according to Mr. Duhon and Mr. Dunn, nothing was done to address the bleeding during the first bypass run. Whether Dr. Jones instructed the surgical staff to pack the bleeding with lap pads and whether this was carried out by the surgical staff is a genuine issue of material question of fact. Furthermore, Dr. Jones testified that although he saw the blood located next to the patient's groin, he never saw the blood located on the floor. This raises a question of whether he was aware of the extent and the magnitude of the patient's bleeding during the robotic surgery.

Accordingly, we find that genuine issues of material fact exist with regard to whether the surgical staff failed to adequately monitor the tourniquet or document the procedure. We further find genuine issues of material fact exist with regard to whether the surgical staff failed to timely and properly tend the excessive bleeding by failing to effectively communicate the bleeding issue and the magnitude of the bleeding to the surgeon and by failing to seek assistance up the chain of command when the surgeon failed to address the bleeding.

With regard to causation, Mr. Stammers causally related the patient's low blood flow rates and subsequent metabolic acidosis to Ms. Falconer's failure to provide adequate perfusion during cardiopulmonary bypass. Ms. McDonald, considering the patient's comorbidities, causally related the patient's hypovolemia, the fact that she coded on the operating table, and her rocky post-operative outcome, to the surgical staff's failure to effectively communicate the extent of the bleeding and their failure to seek assistance up the chain of command when the surgeon failed to address the bleeding. Furthermore, Dr. Traylor causally related the patient's complications and ultimate death to the failure to timely address the hemorrhage at

the femoral artery cannula site. Whether this issue relates to Ms. Falconer and the surgical staff is a genuine issue of material fact.

Although Mr. Hawkins and Ms. McDonald both found violations by LGMC's leadership of the Joint Commission and CMS Conditions for Participation standards based on their failure to implement policies, procedures, and training relative to patient safety and advocacy, as well as its own protocols and policies, none of these allegations were alleged in the DeHarts' petition. These types of claims were included in the DeHarts' January 20, 2015 amended petition. However, this petition was vacated and dismissed with prejudice by the trial court's March 12, 2015 judgment. Once the matter returned to the trial court following the second medical review panel opinion, the DeHarts never amended their petition to include these allegations.

Accordingly, based on our finding that genuine issues of material fact exist with regard to both Ms. Falconer's and the surgical staff's breach of the standard of care and causation on the issue of excessive bleeding, we render judgment denying LGMC and Ms. Falconer's motion for partial summary judgment on this issue.

## *Assignment of Error Number Three*

In this assignment of error, the DeHarts argue that the trial court erred in granting summary judgment on the informed consent issue because they established that genuine issues of material fact exist with regard to whether LGMC breached its duty of obtaining a properly completed informed consent form from Mrs. DeHart. Despite acknowledging that the duty of obtaining informed consent rested with Dr. Jones, they argue that LGMC, as a Medicare provider, was bound by the standards imposed by the Joint Commission and CMS Conditions of Participation, vis-à-vis implementing informed consent policies and procedures "to make sure that informed consent is provided to and properly executed by the patient via the surgeon[,]" and

43

"to outline how the informed consent procedure is to be achieved." They argue that this was especially true based on the marketing campaign utilized by LGMC to promote Dr. Jones and the da Vinci® Surgical Robot to cardiac patients.

Thus, the DeHarts claim that "the duty [LGMC] assumed was not to 'obtain' informed consent but to make sure the informed consent was 'obtained' by making sure the form they required to be executed was filled out properly." Because Mrs. DeHart's informed consent form contained blanks, they argue that it failed to comply with either LGMC's Operating Room Procedure Manual or La.R.S. 40:1157.2. Thus, they claim this raised a rebuttable presumption of negligent failure by LGMC to conform to the duty of disclosure.

The DeHarts alleged the following acts of negligence related to informed consent in their petition:

B.   Failing to fully inform the deceased of alternative approaches and the risk associated with those approaches given her preexisting condition, falling below the appropriate standard of care.

. . . .

G.   Failing to properly obtain informed consent from Arlene Dehart [sic][.]

H.   Misleading through advertisement and marketing the risks associated with the type of surgery offered to Arlene DeHart.

Based on the DeHarts' acknowledgment of Dr. Jones' duty with regard to informed consent, we find that the only allegations pertaining to LGMC are "G." and "H."

In their motion, the defendants moved for partial summary judgment on the issue of whether LGMC had a legal duty to inform Mrs. DeHart of the risks associated with the robotic surgery and whether there was a causal link between its advertising campaign for its robotically-assisted surgical program and her damages. The defendants satisfied their burden of pointing out an absence of factual support

44

for the DeHarts' claim through the medical review panel opinion, which found that LGMC "was not responsible for informing the patient of the risk benefit of the procedure and did not mislead in any fashion." Thus, the burden shifted to the DeHarts to present sufficient evidence to show that they would be able to satisfy their burden of proof at trial.

In their opposition, the DeHarts introduced advertising material used by LGMC to market Dr. Jones and the da Vinci® Surgical Robot to cardiac patients; deposition testimony from Dr. Raghotham Patlola; La.R.S. 40:1157.2, relative to the Louisiana Medical Disclosure Panel; Mrs. DeHart's informed consent form; Dr. Jones' deposition testimony; Dr. Engleman's affidavit, report, and deposition testimony; Ms. McDonalds' affidavit and report; Mr. Hawkins' affidavit and report; and the defendants' responses to the DeHarts' second set of interrogatories and requests for production of documents and third requests for production of documents.

The evidence submitted by the DeHarts established that LGMC did market Dr. Jones and the da Vinci® Surgical Robot to cardiac patients by promoting the minimally invasive nature of the robotic surgery as effectuated through smaller incisions and reduced recovery time. However, the advertisements did state in several instances that "[m]inimally invasive heart procedures are performed daily at Lafayette General, with or without the one and only da Vinci® Surgical Robot, depending on your condition."

The evidence further established that Mrs. DeHarts' treating cardiologist, Dr. Patlola, diagnosed her with severe central mitral valve regurgitation and determined that her only surgical option was open heart surgery. He referred Mrs. DeHart to Dr. Jones at her request after she had seen LGMC's advertisements regarding Dr.

45

Jones' robotic surgery. He stated that she decided to proceed with the robotic procedure after seeing Dr. Jones and having the procedure explained to her in detail.

In his April 15, 2008 medical report, Dr. Jones noted that Mrs. DeHart reported some shortness of breath with exertion and that she had a mitral insufficiency murmur. He reported:

> This is a very pleasant 52-year-old female with a preserved left ventricular function and severe mitral and tricuspid insufficiency.
>
> I have had a long discussion with the patient regarding her activities of daily living and her lifestyle issues. It does not appear that the valvular status is giving her any symptoms at this time; however, she does have a preserved left ventricular function. I have suggested that if she does so desire to have her valves repaired, now would be the appropriate time to fix her valves. I am certainly amenable to that and I have sent her and her husband home to discuss her options and to return in two weeks with plans for either the surgical scheduling or further medical management.

In his notes from Mrs. DeHart's follow-up visit, Dr. Jones noted she "Does not want sternotomy."

Dr. Engleman opined that Dr. Jones breached the standard of care by not conducting pre-operative imaging of the patient's aorto-iliac vascular system prior to surgery and by failing to properly control the femoral artery during surgery. He further stated that "[s]evere peripheral vascular disease is a relative contraindication[] to femoral cannulation when other access sites are available." He testified that when he rejects a patient for femoral cannulation, he either cannulates through the chest, if the patient is on cardiopulmonary bypass, or at the apex of the heart, if bypass is not involved.

The stated purpose of LGMC's policy, III: A-2 Consents, is "[s]urgery is performed only when the patient has given informed consent." In its general information subsection, the manual states:

> Each circulator must check the patient's chart for a properly executed consent form. If the consent form is not properly executed or the patient

is unaware of the procedure to be performed the case is put on "hold" and the attending surgeon notified. Surgery is performed only when these criteria are met in order to ensure the highest quality of patient care.

A properly completed consent form contains:

1.  Correct operative procedure.
2.  Patient's name written in full in the proper space.
3.  Patient's signature or designee according to hospital policy.
4.  Witnessed by a person 18 years or older.
5.  Properly dated and timed according to when the patient's signature was obtained.
6.  All blanks filled in or with line drawn through blank spaces.

The procedure subsection provides the following:

1.  Review chart for presence of consent form.
2.  Interview patient.
3.  If the consent form is missing or incorrect and/or the patient is not aware of the procedure to be done notify the OR Director or designated authority immediately. The case will be placed on "hold" and the surgeon notified of the situation.
4.  If the consent form is incorrect the patient must sign a new consent form.
5.  If the patient has received a mind altering drug (pre-op medication), an assessment of the patient's cognition will be made and a determination if the patient is able to sign the consent.
6.  Two people must witness consent when a patient uses a "X" or a mark for signature.
7.  Two people, each of who must have heard the conversation in which a verbal permission was granted via a telephone conference call, must witness telephone consents.
8.  In the case of an emergency, document in the Interoperative Nurses Notes that the surgeon was notified of the absence of a consent before the beginning of the procedure.

The September 30, 2008 informed consent form, signed by Mrs. DeHart, states that the procedure to be performed is a robotic mitral valve and tricuspid valve repair and replacement with video. The form states that purpose of the procedure is to improve heart function and that Dr. Jones and Ms. Conner would be performing the procedure. The form states that the procedure is being performed with the robot to repair and replace the damaged mitral valve, and lists the procedure specific risks as bleeding, infection, death, and stroke. Those sections of the form pertaining to

47

the patient's condition, the additional risks particular to the patient because of a complicating medical condition, the reasonable therapeutic alternative and associated risks, and the risks of no treatment were left blank.

Ms. McDonald determined that based on III: A-2, LGMC breached its duty of educating its surgical staff on the requirement that surgical patients' informed consent forms must be properly executed. She stated that the informed consent form contained blanks that were not struck through, and it failed to disclose all of the material risks identified by the Louisiana Medical Disclosure Panel for any procedure requiring cardiopulmonary bypass (LAC 48:I.2333) and the insertion of an intra-aortic augmentation balloon (LAC 48:I.2335).

Based on nursing standards of care, Ms. McDonald admitted that nurses are not required to obtain informed consent, but stated that nurses have a duty to validate that the informed consent form is signed and that the patient understands the procedure as explained by the surgeon. She stated, "If the patient expresses doubt or hesitates[,] the nurse has a duty to notify the physician and not allow the patient to sign until full understanding is obtained and all questions answered. Nurses must follow hospital policies on Informed Consent."

Mr. Hawkins stated that LGMC, as a Medicare approved facility, agreed to abide by the CMS Conditions of Participation and "to meet or exceed all of the national standards of the accrediting body (in this case) the Joint Commission which the CMS program has granted 'deeming' status." He further stated that "[s]hould [LGMC] fail to meet or exceed the CMS conditions of participation or the Joint Commission national standards they place at risk the entirety of their Medicare/Medicaid funding which on a national basis represents approximately 50% of an acute care [hospital's] revenue." Mr. Hawkins' report, as discussed under the DeHarts' second and fourth assignments of error, offered six expert opinions to a

48

reasonable degree of administrative certainty. He also included a copy of CMS's

Medicare Enrollment Application for Institutional Providers.

The informed consent statute in effect at the time of Mrs. DeHart's surgery

was contained in La.R.S. 40:1299.40, rather than La.R.S. 40:1157.2, as cited by the

DeHarts.[14] Louisiana Revised Statutes 40:1299.40 provided three methods by which

the physician actually performing the surgical procedure could obtain informed

consent from the patient. In *Snider v. Louisiana Medical Mutual Insurance Co.*, 13-

579, pp. 7-15 (La. 12/10/13), 130 So.3d 922, 929-35 (alteration in original)

(footnotes omitted), the supreme court thoroughly explained the uniform consent

law:

> Louisiana enacted its Uniform Consent Law, as LSA-R.S.
> 40:1299.40, in 1975. Prior to the amendment of LSA-R.S. 40:1299.40
> in 1990 to add Subsection (E), battery-principle cases and negligence
> cases involving lack of informed consent were concurrently available
> to a patient/plaintiff. *See Thibodeaux v. Jurgelsky*, 2004-2004
> (La.3/11/05), 898 So.2d 299, 303 (citing *Pizzalotto v. Wilson*, 437
> So.2d 859 (La.1983) (discussing the cause of action for battery);
> *LaCaze v. Collier*, 434 So.2d 1039 (La.1983) (discussing the cause of
> action for lack of informed consent); and Gary L. Boland, *The Doctrine
> of Lack of Consent and Lack of Informed Consent in Medical Procedure
> in Louisiana*, 45 La.L.Rev. 1 (1984)). As stated in Subsection (E) of
> LSA-R.S. 40:1299.40, in a suit against a physician or other health care
> provider, involving a health care liability or medical malpractice claim
> based on the failure of the physician or other health care provider to
> disclose or adequately to disclose the risks and hazards involved in the
> medical care or surgical procedure rendered by the physician or other
> health care provider, "the only theory on which recovery may be
> obtained is that of negligence in failing to disclose the risks or hazards
> that could have influenced a reasonable person in making a decision to
> give or withhold consent." *See* LSA-R.S. 40:1299.40(E)(2)(a).
> Louisiana jurisprudence requires that a plaintiff in an action based on a
> failure to obtain informed consent prove the following four elements in
> order to prevail: (1) a material risk existed that was unknown to the
> patient; (2) the physician failed to disclose the risk; (3) the disclosure
> of the risk would have led a reasonable patient in the patient's position
> to reject the medical procedure or choose another course of treatment;

---

[14] La.R.S. 40:1299.40 was repealed and re-enacted as La.R.S. 40:1299.39.5, 40:1299.39.6, and 40:1299.39.7 by 2012 La. Acts No. 759, § 2, effective June 12, 2012. La.R.S. 40:1299.37.5 and 40:1299.39.6 were redesignated as La.R.S. 40:1157.1 and 40:1157.2 by 2012 La. Acts No. 600, § 2, effective June 7, 2012.

and (4) the patient suffered injury. *See Brandt v. Engle*, 2000-3416 (La.6/29/01), 791 So.2d 614, 619 n. 1.

The informed consent doctrine is based on the principle that every human being of adult years and sound mind has a right to determine what shall be done to his or her own body. Surgeons and other doctors are thus required to provide their patients with sufficient information to permit the patient himself to make an informed and intelligent decision on whether to submit to a proposed course of treatment. Where circumstances permit, a patient should be told the nature of the pertinent ailment or condition, the general nature of the proposed treatment or procedure, the risks involved in the proposed treatment or procedure, the prospects of success, the risks of failing to undergo any treatment or procedure at all, and the risks of any alternate methods of treatment. *Hondroulis v. Schuhmacher*, 553 So.2d 398, 411 (La.1988) (on rehearing).

The Uniform Consent Law provides three approaches for obtaining informed consent. *See* LSA-R.S. 40:1299.40(E)(2)(b) ("Consent to medical treatment may be evidenced according to the provisions of Subsections A and C of this Section or, as an alternative, a physician or other health care provider may choose to avail himself of the lists established by the Louisiana Medical Disclosure Panel pursuant to the provisions of . . . Subsection [E] as another method by which to evidence a patient's consent to medical treatment.").

First, under Subsection (A) of LSA-R.S. 40:1299.40, consent to any medical or surgical procedure could be obtained by "handwritten consent," which: (1) sets forth in general terms the nature and purpose of the procedure(s) and the known risks of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, and/or of disfiguring scars associated with such procedure(s); (2) acknowledges that such disclosure of information has been made and that all questions asked about the procedure(s) have been answered in a satisfactory manner; and (3) is signed by the patient. Upon compliance with Subsection (A), consent is "presumed" to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts. *See* LSA-R.S. 40:1299.40(A)(1).

Second, under Subsection (C) of LSA-R.S. 40:1299.40, when consent to medical treatment from a patient has been secured "other than" in accordance with Subsection (A) of LSA-R.S. 40:1299.40, the explanation to the patient must include the matters set forth in Subsection (A), and an opportunity must have been afforded to the patient for asking questions concerning the procedure(s) to be performed, which must have been answered in a satisfactory manner. Consent obtained under LSA-R.S. 40:1299.40(C), is considered "valid and effective" and is "subject to proof according to the rules of evidence in ordinary cases."

Third, under Subsection (E) of LSA-R.S. 40:1299.40, informed consent may be obtained by making the disclosures required by the Louisiana Medical Disclosure Panel ("Panel"), which was created within the Department of Health and Hospitals to determine which risks and hazards related to medical care and surgical procedures must be disclosed by a physician or other health care provider to a patient and to establish the general form and substance of such disclosure, pursuant to LSA-R.S. 40:1299.40(E)(3)(a). The Panel is tasked with identifying and examining all medical treatments and surgical procedures in which physicians and other health care providers may be involved, in order to determine which of those treatments and procedures do or do not require disclosure of the risks and hazards to the patient. The Panel prepares separate lists of those medical treatments and surgical procedures that do or do not require disclosure, and, for those treatments and procedures that do require disclosure, the Panel establishes the degree of disclosure required and the form in which the disclosure will be made. *See* LSA-R.S. 40:1299.40(E)(4)(a) and (b). The Panel lists are promulgated in accordance with the Administrative Procedure Act, LSA-R.S. 49:950 et seq. *See* LSA-R.S. 40:1299.40(E)(4)(c). Before a patient gives consent to any medical or surgical procedure that appears on a Panel list requiring disclosure, the physician or other health care provider must disclose to the patient the risks and hazards involved in that kind of care or procedure. *See* LSA-R.S. 40:1299.40(E)(5).

A physician or other health care provider who chooses to utilize the lists prepared by the Panel in connection with obtaining a patient's consent is considered to have complied with the requirements of the subsection if disclosure is made as provided in LSA-R.S. 40:1299.40(E)(6). *See* LSA-R.S. 40:1299.40(E)(5). Pursuant to LSA-R.S. 40:1299.40(E)(6), consent to medical care that appears on a Panel list requiring disclosure is considered effective if it: (1) is given in writing; (2) is signed by the patient; (3) is signed by a competent witness; and (4) specifically states, in such terms and language that a layman would be expected to understand, the risks and hazards that were involved in the medical care or surgical procedure in the form and to the degree required by the Panel. When the Panel has made no determination regarding a duty of disclosure for medical care or a surgical procedure, the physician or other health care provider is under a general duty to disclose as otherwise imposed by the Uniform Consent Law. *See* LSA-R.S. 40:1299.40(E)(7)(b).

In order "to be covered" by the provisions of Subsection (E) of LSA-R.S. 40:1299.40, Paragraph (E)(7)(c) directs that the physician or other health care provider who will actually perform the contemplated medical or surgical procedure must also: (1) disclose the risks and hazards in the form and to the degree required by the panel; (2) disclose additional risks, if any, particular to a patient because of a complicating medical condition; (3) disclose reasonable therapeutic alternatives and risks associated with such alternatives; (4) relate that he is obtaining a consent to medical treatment pursuant to the lists formulated by the

51

Panel; and (5) provide an opportunity for the patient to ask any questions about the contemplated medical or surgical procedure, risks, or alternatives and acknowledge in writing that he answered such questions, the receipt of which must also be acknowledged in writing. *See* LSA-R.S. 40:1299.40(E)(7)(c).

When the disclosures are given as required by, and a consent form is executed in accordance with, Subsection (E), the consent is admissible in evidence and creates a rebuttable presumption of compliance with LSA-R.S. 40:1299.40(E)(5) and (6), and this presumption must be included in a jury charge. *See* LSA-R.S. 40:1299.40(E)(7)(a)(i). Conversely, the failure to disclose risks and hazards required to be disclosed under LSA-R.S. 40:1299.40(E)(5) and (6) is also admissible in evidence and creates a rebuttable presumption of a negligent failure to conform to the duty of disclosure set forth in LSA-R.S. 40:1299.40(E)(5) and (6); such a presumption must likewise be included in a jury charge. *See* LSA-R.S. 40:1299.40(E)(7)(a)(ii). Nevertheless, a failure to disclose may be found not negligent if there was an emergency as defined in LSA-R.S. 40:2113.6(C) or if for some other reason it was not medically feasible to make a disclosure of the kind that would otherwise have been negligence.

Based on La.R.S. 40:1299.40(E)(7)(a)(ii), a rebuttable presumption of negligent failure to conform to the duty of disclosure only arises if the physician actually performing the surgery fails to comply with disclosure requirements of La.R.S. 40:1299.40(E)(5) or (6). Here, the DeHarts' allegations are against LGMC, rather than Dr. Jones. Thus, despite their argument otherwise, there is no rebuttable presumption of negligence pursuant to La.R.S. 40:1299.40(E)(7)(a)(ii) on the part of LGMC.

Furthermore, the jurisprudence has held that the sole duty of obtaining informed consent rests with the physician actually performing the surgery. *Crockerham v. La. Med. Mut. Ins. Co.*, 17-1590 (La.App. 1 Cir. 6/21/18), 255 So.3d 604 (hospital has no duty to inform patient of the risks associated with the procedure); *Phillips v. State ex rel. LSU Med. Ctr.*, 08-1411 (La.App. 3 Cir. 4/15/09), 9 So.3d 1080 (duty of obtaining informed consent from patient rests with physician who is actually performing the procedure); *Mohsan v. Roule-Graham*, 05-122 (La.App. 5 Cir. 6/28/05), 907 So.2d 804, *writ denied*, 05-1976 (La. 2/3/06), 922

So.2d 1184 (hospital and its staff were not responsible for obtaining informed consent from the patient); and *Kelley v. Kitahama*, 96-45 (La.App. 5 Cir. 5/15/96), 675 So.2d 1181, *writ denied*, 96-1555 (La. 9/27/96), 679 So.2d 1352 (hospital was not responsible for describing the nature and purpose of the procedure to patient).

We further find that the Joint Commission and the CMS' Conditions for Participation's informed consent standards, as adopted by LGMC, do not impose tort liability upon LGMC as a result of the surgical staff's failure to ensure that Mrs. DeHart's informed consent form was properly filled out. A similar argument was raised in *Godwin v. University of South Florida Board of Trustees*, 203 So.3d 924, (Fla. 2d DCA 2016), *review denied*, SC16-2107, 2017 WL 1034486 (Fla. March 17, 2017), regarding the CMS Conditions for Participation's standard regarding contracted services, as promulgated in 42 C.F.R. § 482.12(e). There, the court stated:

> Finally, Mr. Godwin argues that a statutory duty imposed by Medicare cannot be delegated to an independent contractor. More specifically, Mr. Godwin asserts that the regulations promulgated under the Medicare Act require hospitals that participate in the Medicare program to maintain a nondelegable duty to provide nonnegligent care. *See* 42 C.F.R. § 482.12. No Florida appellate court has reached this conclusion. We decline the invitation to be the first.
>
> Section 482 identifies the conditions of participation for hospitals in the Medicare program. 42 C.F.R. § 482.1(b). This section was intended to specify the standards that the federal government will assess when determining whether or not a hospital will continue to be eligible to treat Medicare patients. *Id.* ("[T]he provisions of this part serve as the basis of survey activities for the purpose of determining whether a hospital qualifies for a provider agreement under Medicare and Medicaid."); *see also Sepulveda v. Stiff*, No. 05cv167, 2006 WL 3314530, at *8 (E.D.Va. Nov. 14 2006) (finding that section 482.1 et seq. are "intended to set out the guidelines for determining whether a hospital may participate in Medicaid"); *Blackmon v. Tenet Healthsystem Spalding, Inc.*, 288 Ga.App. 137, 653 S.E.2d 333, 340 (2007) ("[Section 482.12(e)] does not purport to impose state tort liability on hospitals for the negligence of their independent contractors; rather it simply outlines that with which the hospitals must comply to receive Medicare."), *rev'd in part on other grounds*, 284 Ga.

369, 667 S.E.2d 348 (2008), *vacated in part on other grounds*, 294 Ga.App. 423, 669 S.E.2d 237 (2008).

The Department of Health and Human Services clarified that section 482.12(e) "indicate[s] that the governing body is responsible for assuring that the contractor furnishes services that permit the hospital to comply with all applicable conditions of participation and standards for the contracted services." Medicare and Medicaid Programs; Conditions of Participation for Hospitals, 51 Fed. Reg. 22,010-01, 22,015 (June 17, 1986) (to be codified at 42 C.F.R. p. 482). The quality assurance condition, section 482.21, was revised "to assure that services provided under contract that relate to patient health and safety are included for evaluation in the quality assurance plan." Medicare and Medicaid Programs; Conditions of Participation for Hospitals, 51 Fed. Reg. at 22,015.

The rule does not create liability for the hospital due to the negligence of any independent contractor. Instead, the rule and the discussion and responses to public comments explain that the services that a contractor furnishes to a hospital will be part of the quality assurance evaluation for the hospital's continued participation in the Medicare program. The rule does not purport to diminish or preempt state laws dealing with the traditional common law theories of principal/agent and independent contractors. *See La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 368, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986) ("Pre-emption occurs when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law. . . .").

Mr. Godwin's call for the imposition of strict liability on TGH for its hospital employees, agents, or independent contractors finds no support in the language of the Medicare statute or related regulations.

*Id.* at 931-32 (alterations in original) (footnote omitted).

Likewise, we find that LGMC's informed consent rules, adopted in order to satisfy the CMS's Conditions for Participation, do not purport to impose state tort liability on it or diminish or preempt Louisiana state law, which imposes the duty of obtaining informed consent solely on the physician actually performing the procedure. La.R.S. 40:1299.40. Nor do we find that LGMC's marketing campaign altered this finding. The duty to ensure that Mrs. DeHart was a suitable candidate for the proposed robotic surgery still rested with Dr. Jones, as acknowledged by the DeHarts. Accordingly, we find that the DeHarts failed to establish that a genuine

54

issue of material fact existed with regard to the informed consent issue and affirm the trial court judgment on this issue.

## DISPOSITION

Based on the foregoing reasons, we vacate the trial court judgment granting partial summary judgment in favor of Lafayette General Medical Center and Amy Falconer on the issue of excessive bleeding, and render judgment denying Lafayette General Medical Center and Amy Falconer's motion for partial summary judgment on the same issue. We further affirm the trial court judgment granting partial summary judgment in favor of Lafayette General Medical Center and Amy Falconer on the issue of informed consent. This matter is remanded to the trial court for further proceedings in conformity with this opinion. The costs of this appeal are assessed equally between the parties.

**JUDGMENT VACATED IN PART AND RENDERED; AFFIRMED IN PART; AND REMANDED.**